UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S.M.,

                      Plaintiff,

        – against –

OXFORD HEALTH PLANS (NY), INC., a/k/a
OXFORD HEALTH INSURANCE, INC.;
OXFORD HEALTH PLANS, LLC; UNITED
HEALTHCARE SERVICES, INC.; and
UNITEDHEALTH GROUP INCORPORATED,

                      Defendants.

**OPINION AND ORDER**

12 Civ. 4679 (ER)

RAMOS, D.J.:

      Plaintiff S.M.[1] brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C § 1001 *et seq.*, against Oxford Health Plans (NY), Inc., a/k/a Oxford Health Insurance, Inc. ("Oxford"), Oxford Health Plans, LLC ("Oxford LLC"), United Healthcare Services, Inc. ("United Healthcare"), and UnitedHealth Group Inc. ("UnitedHealth"), (collectively, "Defendants").  Plaintiff, who was diagnosed with non-Hodgkin's lymphoma, claims that Defendants wrongfully denied her coverage for Gamunex, an immune-boosting drug prescribed by her oncologist.  In particular, Plaintiff maintains that Oxford's determination that Gamunex was not "medically necessary" in her case was improper and constituted a violation of ERISA.

---

[1] On June 29, 2012, this Court ordered that the notice of removal and its exhibits be sealed, that other docketed documents be redacted to protect Plaintiff's privacy, and that Plaintiff be referred to by her initials in court filings. Doc. 9.

Presently before the Court are the parties' cross-motions for summary judgment, both made pursuant to Federal Rule of Civil Procedure 56, and Plaintiff's motion to sever.  *See* Docs. 66, 67.  For the reasons discussed below, Plaintiff's motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.  Plaintiff's motion to sever is DENIED.

## I.   Background[2]

The following facts are undisputed except where otherwise noted.

### A.  Plaintiff's Medical Condition

In September 2008, Plaintiff was diagnosed with non-Hodgkins lymphoma.  Defs.' Counterstatement Facts, Doc. 80 at ¶ 2.  Since then, she has been treated by Dr. Janet Cuttner ("Dr. Cuttner"), an oncologist at Mount Sinai Hospital.  *Id.* at ¶ 3.  As part of Plaintiff's treatment, she has been treated with a drug called Rituxan.[3]  *Id.* at ¶ 4.

In August 2011, Dr. Cuttner diagnosed Plaintiff with an upper respiratory infection; the following month, Plaintiff was diagnosed with severe pneumonia.  *Id.* at ¶¶ 6-7.  In response, Dr. Cuttner prescribed Intravenous Immunoglobulin ("IVIG") treatment in the form of the drug Gamunex.  Pl.'s Counterstatement Facts, Doc. 77 at ¶ 11.  Gamunex consists of a solution containing antibodies to help fight infections.  *Id.* at ¶ 12.  It is used to treat, inter alia, autoimmune and immune deficiency disorders and may be administered to increase the

---

[2] The following facts are drawn from the Parties' Local Civil Rule 56.1 Statements, along with the administrative record.  Defendants indicate that the administrative record consists of 377 pages that Defendants produced, labeled Oxford 000001-000377, and sixty-five pages that Plaintiff produced, labeled P-00001-00065.  *See* Defs.' Sur-Reply, Doc. 94 at 2-3.

[3] Plaintiff characterizes Rituxan as a form of chemotherapy.  Pl.'s Stmt. Material Facts, Doc. 74 at ¶ 4.  Defendants counter that Rituxan is also used for non-chemotherapy purposes for patients suffering from various ailments besides non-Hodgkin's lymphoma and other types of cancer.  Doc. 80 at ¶ 4.

gammaglobulin levels in patients with immune deficiencies, such as those whose immune systems are compromised as a result of undergoing chemotherapy.  *Id.* at ¶ 12; *see also* Doc. 80 at ¶ 10.  The instant litigation concerns Oxford's denial of coverage for Plaintiff's Gamunex treatment in 2011.

## B. Plan Terms

In 2011, Plaintiff was covered by an Oxford healthcare plan entitled Freedom Plan Metro ("the Plan") which qualified as "an employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002(1).[4]  Doc. 77 at ¶¶ 1-2; Doc. 80 at ¶ 5.   The Plan provides that a beneficiary will receive "Covered Services" when it is: (1) medically necessary; (2) properly referred/pre-certified, when required; and (3) while the beneficiary's coverage is still in force.  Doc. 77 at ¶ 2, *see also* Oxford 000202.  Under the Plan, Oxford has discretion to deny coverage for any health care service that it determines, in its "sole judgment," to be medically unnecessary.  *Id.* at ¶ 3; *see also* Oxford 000212.  The term "medically necessary" is defined by the Plan to include a service or supply which, as determined by its medical director, is:  (1) "[c]onsistent with the symptoms or diagnosis and treatment" of the member's condition; (2) "[a]ppropriate with regard to standards of good medical practice[;]" (3) not for the sole convenience of the member or a provider; and (4) "[t]he most appropriate supply or level of service which can safely be provided."  Oxford 000228; *see also* Doc. 77 at ¶ 3.  The Plan goes on to state that "[u]nless otherwise indicated . . . determinations as to Medical Necessity are made by Us, and such determinations are solely within Our discretion."  *Id.*; *see also* Doc. 77 at ¶ 3.

---

[4] The documents referred to as "the Plan" include the Member Handbook and New York Certificate of Coverage, which provide the details of Plaintiff's coverage.  *See* Oxford 000146-000229.

After a member receives an initial adverse determination, she may challenge the administrator's determination by utilizing what the Plan refers to as the Utilization Review ("UR") Appeals process. Oxford 000162. The UR Appeals process provides for either "two levels of internal review" or "one level of internal [r]eview and one level of [e]xternal [r]eview by an outside clinical reviewer." *Id.* The Plan states that medical necessity determinations which result in a denial will be made by "appropriate clinical personnel," specifically, a "clinical peer reviewer." Oxford 000159. Although the Plan does not define who constitutes a clinical peer reviewer for the purposes of an initial adverse determination, it does provide a definition with respect to an internal appeal. When an internal UR Appeal is involved, a clinical peer reviewer is either: "a Physician with a current and valid non-restricted license to practice medicine;" or "a health care professional (other than a licensed Physician) . . . in the same professional and same or similar specialty as the Provider who typically manages the medical condition or disease[.]" Oxford 000162. Requests that are eligible for an external appeal "will be randomly assigned to a Certified External Appeal Agent[.]" Oxford 000167. At the external appeal level, a clinical peer reviewer is a licensed Physician who "is board certified or board eligible in the same or similar specialty as the Provider who typically manages the medical condition or disease, or provides the health care service or treatment under Appeal;" and "has been practicing in such an area of specialty for a period of at least five years and is knowledgeable about the Health Care Service or treatment under Appeal." Oxford 000162.

Under the Plan, a member is responsible for providing, "to the extent possible, information that [Oxford] professional staff need in order to care for" the member. Oxford 000185, 000223; *see also* Doc. 77 at ¶ 5. In making medical necessity determinations, the administrator may request additional information from the member's provider and will deny

coverage if such additional information is not received within forty-five days of its request. Oxford 000159; *see also* Doc. 77 at ¶ 5.

Plaintiff's request for Gamunex coverage was also governed by Oxford's specific policy on IVIG treatment coverage.[5]  Doc 69 at ¶ 7.  The policy states that the documentation required for medical director review of an initial request for IVIG treatment coverage consists of:  (1) the diagnosis; (2) office notes indicating the patient's history, failure of conventional therapy, and lab work supporting the need for IVIG; and (3) "clinically significant functional deficiency of humoral immunity as evidenced by documented failure to provide antibodies to specific antigens and a history of recurrent infections."[6]  P-00050.  Medical director review of a request for continuation of therapy requires additional information documenting:  (1) "an objective response to therapy[;]" (2) "the medical condition under treatment has not fully resolved[;]" (3) "a sustained beneficial response to treatment[;]" (4) the "expected frequency and duration of proposed IVIG treatment[;]" (5) "[t]itration to the minimum dose and frequency to maintain a sustained clinical effect;" and (6) serum immunoglobulin levels prior to therapy for certain diagnoses.  *Id*.  The policy explicitly provides that initial approvals are for a period of three months, unless otherwise noted.  *Id*.

---

[5] Plaintiff counters that the relationship between the IVIG policy and her plan is unclear, and that the requests for information that she and her Provider received do not comport with the policy.  Doc. 77 at ¶¶ 7-8.  However, the evidence clearly contradicts this assertion.  Oxford's requests for information submitted to Dr. Cuttner's office conformed to the IVIG policy requirements, nearly verbatim.  *Compare* P-00050, *with* P-00040, Oxford 000376, P-00041.

[6] The policy requires additional documentation for a diagnosis of hypogammaglobulinemia, showing the "persistent absence of IgG1, IgG2, and/or IgG3."  P-00052.  It also states that hypogammaglobulinemia "generally does not require IVIG replacement for control of recurrent bacterial infections."  *Id*.

### C.  Plaintiff's Application for Benefits

On September 15, 2011 Dr. Cuttner submitted Plaintiff's first request for coverage of Gamunex treatment to Oxford.  Doc. 80 at ¶ 13.  On the same day, Oxford requested additional information from Plaintiff to process her claim.  Doc. 80 at ¶ 12.  In a letter dated September 16, 2011, Oxford informed Plaintiff of its decision to deny coverage.  Doc. 77 at ¶ 14, Doc.  80 at ¶ 13.  The letter explained that Oxford usually covers IVIG treatment for certain types of problems, such as an immune deficiency, and for repeat bacterial infections.  Oxford 000075.  It also stated that a member's doctor must show that the patient "cannot make antibodies against immunizations or common bacteria."  *Id*.  The letter concluded, "[t]he information sent in does not show that you meet these criteria."  *Id*.  The medical necessity determination was made by one of Oxford's medical directors, Dr. Bruce Lundblad.  Doc. 80 at ¶ 13.  Plaintiff requested an expedited appeal of the decision on September 19, 2011.  Doc. 77 at ¶ 15.

Dr. Lundblad called Dr. Cuttner on September 21, 2011.  Doc. 77 at ¶ 16, *see also* Doc. 80 at ¶ 16.  Based on his conversation with Dr. Cuttner, Dr. Lundblad changed his initial determination to allow for coverage of Plaintiff's Gamunex treatment.  *Id.* at ¶ 19.  In Dr. Lundblad's notes contained in Plaintiff's Individual Authorization Report ("IAR"), he documented that Dr. Cuttner informed him that Plaintiff has a history of non-Hodgkins lymphoma, severe pneumonia, and some previous infections which were not documented.  Oxford 000019.  He further noted, "[w]ill change my determination because request at least nearly meets criteria and because of history of recent severe bilateral pneumonia."[7]  *Id*.  The next

---

[7] Plaintiff counters that, in Dr. Lundblad's deposition, he admitted that he knew Plaintiff had pneumonia as early as September 16, 2011.  Doc. 77 at ¶ 20 (citing Smith. Decl., Doc. 76 at 31:21-23).  However, in the deposition testimony provided to the Court, it does not appear that Dr. Lundblad was aware of the severity of Plaintiff's pneumonia when he made the initial adverse determination.  *See* Smith. Decl., Doc. 76 at 31:21-23.

day, on September 22, 2011, Dr. Lundblad made a new entry in Plaintiff's IAR, stating:

"Additional note:  My decision to approve IVIG is only for 3 months.  For renewal or

continuation, additional clinical information will be required."[8]  Oxford 000019.  Plaintiff's

Gamunex therapy was covered by Oxford from late September through late November 2011.

Doc. 80 at ¶ 22.

On November 22, 2011, Dr. Cuttner's office requested an extension of Oxford's coverage

of Plaintiff's IVIG treatment until September 19, 2012.  Doc. 77 at ¶ 23, *see also* Doc. 80 at ¶ 23.

The following day, Oxford sent a letter to Plaintiff requesting additional information regarding

her current medical condition.  *Id*. at ¶ 24.  On December 5, 2011, Dr. Cuttner's office sent

Oxford a facsimile containing the following documents:  (1) Dr. Cuttner's progress notes from

September 13, 2011 to November 29, 2011; (2) lab test results from June, September and

November 2011; and (3) explanations and impressions of Plaintiff's CT scan in September

2011.[9]  Doc. 77 at ¶ 25.  On December 6, 2011, Dr. Lundblad submitted a second request for the

following additional information regarding Plaintiff's condition:[10]  (1) the member's diagnosis

and the basis for it; (2) whether the condition under treatment has fully resolved;

(3) documentation of an objective sustained beneficial response to therapy; (3) the expected

duration and frequency of the proposed IVIG treatment; (4) baseline Immunoglobulin G ("IgG")

---

[8] Plaintiff characterizes this entry as evidence of Dr. Lundblad "changing his mind for a second time."  Doc. 74 at ¶ 20.  Defendant maintains that this description is unsupported by the facts.  Doc. 80 at ¶ 20.

[9] Plaintiff indicates that these records reflect Plaintiff's medical condition with the benefit of Gamunex treatment.  Doc. 77 at ¶ 25.

[10] The administrative record contains different dates pertaining to Oxford's second request for information.  The entry in the IAR pertaining to the request for additional information is dated December 6, 2011.  Oxford 000014, 000020.  However, the actual facsimile from Oxford to Dr. Cuttner's office containing the request indicates that it was sent on December 7, 2011.  P-00041.

levels and documentation of impaired antibody production to specific antigens; and (5) a history of recurrent infections.  Oxford 000020; *see also* P-00041.

On December 7, 2011, Dr. Cuttner's responded to Oxford's second request for information by resubmitting the same medical records, along with a letter from Dr. Cuttner.  *See* Oxford 000363-000374.  In her letter, Dr. Cuttner stated that Plaintiff was diagnosed with an upper respiratory infection in August 2011, and "very severe pneumonia" in September 2011.  P-00024.  Dr. Cuttner wrote that Plaintiff was successfully treated with antibiotics and received Gamunex treatment since October 2011.  *Id.*  Plaintiff's doctor confirmed that her pneumonia had resolved and her gammaglobulin levels were normal, "which shows the gammaglobulin treatment is working."  *Id.*  Dr. Cuttner concluded that "[i]t would be important for the patient to continue prophylactic treatment with Gamunex through the winter months" and referred Oxford to the attached chest x-ray, CT scan, and past and present IgG levels.  *Id.*

That same day, Dr. Lundblad determined that Plaintiff's IVIG treatment was not medically necessary.[11]  Doc. 77 at ¶ 29, *see also* Doc. 80 at ¶ 28.  In his notes on Plaintiff's IAR, Dr. Lundblad stated that his decision was based on a lack of evidence that Plaintiff had a confirmed diagnosis of "CVID" (presumably, common variable immunodeficiency) or "other covered/approved indication."  Oxford 000020.  Furthermore, there was no documentation of "impaired antibody production to specific antigens" or "that the medical condition under treatment has not fully resolved."[12]  *Id.*  His notes further indicate that, on December 14, 2011,

---

[11] Plaintiff characterizes Dr. Lundblad's denial of coverage as him having "changed his mind for a third and last time."  Doc. 74 at ¶ 28.  Defendants dispute this description, stating that Plaintiff's December 7, 2011 request for coverage was "separate and distinct" from her September 2011 request.  Doc. 80 at ¶ 28.

[12] Defendants contend that, based on the documents Dr. Cuttner submitted, at the time of the request, Plaintiff's IgG levels were in a normal range, she reported feeling well, having a good appetite, no muscle or joint pain, chest pain, headache, or fever.  Doc. 69 at ¶ 45.  Furthermore, Dr. Cuttner stated that"[a]ny further IVIG treatment would be for

he discussed his denial with Dr. Cuttner.  *Id*.  In the same entry he states, "[p]reviously approved for 3 months as an exception in the setting of a life threatening pneumonia.  However the pneumonia has resolved . . . there is no documentation that the medical condition under treatment has not fully resolved . . . denial upheld at this time."[13]  *Id*.  In his deposition, Dr. Lundblad confirmed that he did not consult with any oncologists in reaching his determination.[14]  Doc. 80 at ¶ 30.  Defendants do not dispute that he was not aware that Plaintiff's non-Hodgkins lymphoma was being treated with Rituxan.  Doc. 80 at ¶ 43.

In a letter dated December 8, 2011, Oxford informed Plaintiff of its denial.  Oxford 000093.  The letter stated that IVIG treatment is covered for specific types of problems such as immune deficiency and repeat infections.  *Id*.  However, a member's doctor is required to show that the patient "cannot make antibodies against immunizations or bacteria" and that the patient's problem "has not fully resolved."  *Id*.  The letter concluded, "[t]he information sent in does not show that you [Plaintiff] meet these criteria."  *Id*.

### D.  Plaintiff's Appeals

On December 19, 2011 Plaintiff requested an expedited appeal of Dr. Lundblad's denial of coverage.  Doc. 77 at ¶ 39.  In connection with Plaintiff's request, Dr. Cuttner's office sent

---

prophylactic measures only."  *Id*.  Plaintiff objects to this description because it omits the fact that Plaintiff had non-Hodgkins lymphoma as of December 2011 and her condition "cannot be considered without acknowledging the ongoing Gamunex treatment."  Doc. 77 at ¶ 45.

[13] Defendants maintain that the initial approval was indeed granted as an exception to Oxford's policy "due to severe pneumonia."  *See* Doc. 68 at 12.  Plaintiff argues that this notation is inconsistent with Dr. Lundblad's September 2011 determination, in which his approval was based on "previous infections" and "recent severe bilateral pneumonia."  Doc. 77 at ¶ 32.  In her papers, Plaintiff again points out that Dr. Lundblad did not write anything in the IAR about the initial approval constituting an "exception" at the time he decided to limit coverage to three months.  Doc. 84 at 7.

[14] Plaintiff maintains that Dr. Lundblad did not consult with the oncologists "made available to him."  Doc. 74 at ¶ 30. Defendants counter that Plaintiff omits the portion of Dr. Lundblad's deposition in which he explained that he did not consult with oncologists because he was confident in his decision.  Doc. 80 at ¶ 30.

Oxford a twenty-two page facsimile containing the previously forwarded medical records, Dr.
Cuttner's letter of December 7, 2011, Oxford's November 23, 2011 information request,
handwritten notes and prior facsimile cover sheets. *Id.* By letter dated December 21, 2011,
Oxford informed Plaintiff of its decision to uphold the initial adverse determination, stating that
the basis for its conclusion that it was not medically necessary was a lack of "supporting data
regarding ability to produce function antibody [sic] in response to a vaccine challenge." Doc. 80
at ¶¶ 31-34. Plaintiff's IAR indicates that Plaintiff's appeal was reviewed and denied by Oxford
medical director Dr. Helga Bahr. *See* Oxford 000015, 000346-49.

On January 10, 2012, Plaintiff requested an external review of Oxford's denial of
coverage for Plaintiff's IVIG treatment with the New York State Department of Financial
Services. Doc. 77 at ¶ 41. That same day, an entity certified by the State of New York to
conduct external appeals, which the parties refer to as "MCMC," submitted a request to Oxford
for the production of documents relevant to Plaintiff's denial of coverage. Doc. 80 at ¶ 38. An
Oxford employee named Margaret Williams ("Williams") responded to MCMC's request via
letter dated January 10, 2012, which included a summary of events, Plan documents, and
correspondence regarding Plaintiff's coverage denial and appeal. *Id.* at ¶ 39. On January 13,
2012, MCMC reviewed Oxford's denial of coverage for Plaintiff's Gamunex treatment.[15] Doc.
77 at ¶ 41.

---

[15] The parties agree that MCMC conducted its review in connection with New York State's Medical Care
Ombudsman Program. Doc. 77 at ¶ 41. However, they disagree as to whether MCMC's review was truly
"independent." *Id.* The Amended Complaint implies that the external reviewer was conflicted because Oxford and
UnitedHealth are referred to as MCMC's "clients." Am. Compl. ¶ 3. Plaintiff's papers do not pursue this argument
further, nor has she submitted any evidence to support this claim. Moreover, the external appeal determination
formally attests that the external reviewer "has confirmed that he or she has no material . . . professional, or financial
conflict of interest with . . . [the] health plan (including its officers, directors, or management employees) . . . [or the]
external review organization[.]" Oxford 000121.

According to documentation provided by MCMC, a physician certified in internal medicine with a subcertification in hematology conducted the external review.  Oxford 000122. The reviewer's areas of expertise included leukemia/lymphoma treatment and chemotherapy treatments/side effects.  *Id*.  The external reviewer upheld Oxford's denial of coverage, stating:

> While IVIG treatment in this case has been shown to raise the IgG level, there is insufficient evidence based on the information provided to indicate that withholding IVIG would clearly be detrimental to this patient.  Furthermore, there is also insufficient evidence to clearly indicate that IVIG treatment would be health beneficial.   She has had two infections, and there is no documentation that she had any other infection besides these.  In the absence of a clear history of recurrent infection, and in particular in the absence of any history of recurrent severe or life threatening infections, such as those requiring hospital admission or IV antibiotics, there is insufficient evidence to support the medical necessity of IVIG treatment.  This conclusion is further supported by the lack of any evidence that this patient has deficient humoral responses to vaccination.

Oxford 000124.  The external reviewer also indicated that Plaintiff's medical records and accompanying information were sufficient to determine whether the Plan should cover the treatment she was seeking.  Oxford 000123.

On January 11, 2013, approximately one year after Plaintiff's appeal was denied, Dr. Cuttner submitted another request for coverage of Plaintiff's Gamunex treatment, which included a letter from Dr. Cuttner indicating that Plaintiff's disease "recently transformed to a more aggressive lymphoma" and that she would be receiving "combination chemotherapy" which would "put her at risk of severe infections."  Nguyen 2d. Aff., Ex. A; *see also* Doc. 80 at ¶¶ 68, 70.  An Oxford medical director named Dr. Hui approved coverage for a limited amount of time,

citing Plaintiff's history of pneumonia, her low IgG levels and chemotherapy treatment.[16]   OHP

000011.

### E.  Procedural History

On May 10, 2012, Plaintiff filed a complaint against Defendants in the Supreme Court of

the State of New York, New York County.  Defs.' Joint Notice Removal, Doc. 1, Ex. A.

Plaintiff alleged three causes of action consisting of fraud, deceptive trade practices, and unjust

enrichment.  *Id.*  On June 14, 2012, Defendants removed the state action to this Court on the

basis of federal question jurisdiction, alleging that it was preempted by ERISA.  Doc. 1 at 1-2.

On August 4, 2012, Plaintiff filed a motion to remand this action back to state court.  Pl.'s Mot.

Remand, Doc. 17.  On March 22, 2013, the court denied Plaintiff's motion.[17]  *See* Order, Doc.

25.  The court stated, "S.M. has sued 'only to rectify a wrongful denial of benefits promised

under [an] ERISA-regulated plan[ ],' and '[Defendants'] potential liability . . . derives entirely

from the particular rights and obligations established by the benefit plan [ ].'"  *Id*. at 9 (citing

*Aetna Health Inc. v. Davila*, 542 U.S. 200, 210-211, 213 (2004)).

On April 29, 2013, Plaintiff filed an Amended Complaint, challenging the denial of

benefits under ERISA § 502(a)(1)(B), which provides that a plan beneficiary or participant may

bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights

under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Am. Compl., Doc. 26.  She additionally seeks redress under ERISA § 502(c), which applies

penalties for an administrator's refusal to supply requested information.  *Id.*  The Amended

---

[16] Defendants correctly note that the facts related to Plaintiff's Gamunex treatment in 2013 are contained in documents that fall outside of the administrative record.  Doc. 79 at 7.

[17] The Order was issued by the Honorable Paul Gardephe, to whom this case was previously assigned.

Complaint may also be generously construed as seeking redress for breach of fiduciary duty under ERISA § 502(a)(3).[18]  *Id.*

On April 1, 2014, Magistrate Judge James C. Francis IV, granted Plaintiff's motion to compel production of the IARs authorizing coverage for Rituxan in 2011, 2012, and 2013, and Gamunex in 2012 and 2013.  Doc. 59.

## II.    Legal Standards

### A.  Cross-Motions for Summary Judgment:  Applicable Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of

---

[18] Defendants also interpret Plaintiff's allegations as stating a claim that Oxford denied her a full and fair review. Doc. 68 at 23.  Under ERISA, any participant whose claim for benefits has been denied is entitled to "a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C.A. § 1133(2).  The Amended Complaint does not allege that Oxford denied Plaintiff the opportunity to present evidence, that it failed provide her with access to relevant records at the time of its review, or that she was denied the opportunity to rebut or comment on Oxford's determination.  "A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review."  *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008*)*.  Remand is considered to be unnecessary where it would be futile, as it is here. *Giordano v. Thomson*, 564 F.3d 163, 168 n.3 (2d Cir. 2009) (citing *Krauss*, 517 F.3d at 630).

proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation mark omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)). "[E]ach party's motion must be examined on

its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir.1981)).  The Court is not required to grant summary judgment in favor of either moving party.  *See id.* (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993)).

In ERISA actions challenging the denial of benefits, "the general practice is to treat the parties' submissions as cross-motions for summary judgment, and, if summary judgment is denied because material facts are in dispute, to conduct a 'bench trial' with the Court acting as the finder of fact."  *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 672 (S.D.N.Y. 2011) (citing *Fairbaugh v. Life Ins. Co. of N. Am.*, 737 F. Supp. 2d 68, 79 n.9 (D. Conn. 2010)).  Put simply, a motion for summary judgment "provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record."  *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160 (JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007).  "In such an action 'the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.'"  *Alfano v. CIGNA Life Ins. Co. of New York*, No. 07 Civ. 9661(GEL), 2009 WL 222351, at *12 (S.D.N.Y. Jan. 30, 2009) (quoting *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 780 (S.D.N.Y. 1993)).

## B.  ERISA Standard of Review for Actions Involving Denial of Benefits

"ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996)) (quotation marks omitted).  However, the Supreme Court has held that "a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989).  When such discretionary authority is reserved, a court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'"  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)).  The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies.  *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (citing *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 230 (2d Cir. 1995)).  Here, the parties agree that that the arbitrary and capricious standard of review is appropriate.[19]  *See* Doc. 68 at 3; Doc. 75 at 10-11.

## III.   Discussion

### A.  Defendants' Joint Liability

The parties agree that "Plaintiff enrolled in a . . . Plan . . . covered by Oxford Health Insurance, Inc. [Oxford]."  Doc. 77 at ¶ 1.  However, Defendants argue that the other parties—Oxford LLC, United Healthcare, and UnitedHealth—are not proper defendants in this case because there is a lack of privity between Plaintiff and these three defendants.  Defs.' Mem. L. Supp. Mot. Summary J., Doc. 68 at 1 n.1.  Plaintiff counters that the name "UnitedHealthcare Group Inc." is "featured prominently" on the Plan.  Pl.'s Mem. L. Opp., Doc. 84 at 13.

---

[19] The Court notes that some district courts outside of the Second Circuit have determined that an external review that is binding on the administrator removes the plan from the administrator's discretion, compelling *de novo* review of the final denial of benefits.  *See Alexandra H. v. Oxford Health Ins., Inc.*, No. 11 Civ. 23948, 2013 WL 4002883, at *9 (S.D. Fla. Aug. 6, 2013) ("Accordingly, as the New York external-appeal process requires a plan to divest its discretion in favor of the external reviewer's decision, a de novo standard of review is appropriate here."); *K.F. ex rel. Fry v. Regence Blueshield*, No. 08 Civ. 0890 (RSL), 2008 WL 4223613, at *2 (W.D. Wash. Sept. 10, 2008) (The *de novo* standard of review applies where the administrator's adoption and implementation of the independent review organization's decision "was mechanical and did not involve the exercise of discretion").  While there is no binding Second Circuit case law on this issue, on the facts presented, the Court would uphold Defendants' determination even under a *de novo* standard of review.

However, there is no indication that any of the Defendants in this case operate under the name "UnitedHealthcare Group Inc."  She further maintains that Oxford is a wholly owned subsidiary of UnitedHealth, "operating as Oxford solely for the purposes of using the Oxford brand."  *Id.*

Simply stated, Plaintiff has not established that any Defendant other than Oxford is subject to suit under ERISA.  Defendants' corporate disclosure statement reveals that Oxford, Oxford LLC, and United Healthcare are all wholly owned subsidiaries of UnitedHealth.  Doc. 8. Generally, "a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both."  *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (citing 1 Fletcher Cyc. Corp. § 43 (perm. ed. 1990)).  As a matter of contract law, New York courts will only pierce the corporate veil to "prevent fraud or other wrong, or where a parent dominates and controls a subsidiary."  *Id.*   Plaintiff does not ask the Court to pierce the corporate veil.  Nor does she provide evidence to support her claim that "[a]ll defendants administer the claims jointly and all are directly liable."  Doc. 77 at ¶ 1.  Instead, she assumes that UnitedHealth Group Inc. and all of its subsidiaries must be held jointly liable, simply due to their corporate relationship and the fact that a United Healthcare logo appears on the Plan.[20]

Plaintiff has failed to adequately allege claims against Oxford LLC, United Healthcare, or UnitedHealth.  Therefore, these parties must be dismissed from the case.

---

[20] Plaintiff cites a case in which the Second Circuit stated, "[t]he defendants, Oxford Health Plans, Inc., Oxford Health Plans (N.Y.), Inc., and Oxford Health Insurance, Inc. . . . administer claims for benefits under the plan."  *Krauss*, 517 F.3d at 617.  Plaintiff neglects the case caption in the instant action, which refers to Oxford Health Plans (N.Y.), Inc. and Oxford Health Insurance, Inc. as one entity.  Oxford Health Plans, Inc. is not named as a defendant in this case.

**B. Conflict of Interest**

**i.   Structural Conflict of Interest**

"If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). A structural conflict, standing alone, is insufficient to establish that a conflict of interest actually influenced Oxford's decision to deny benefits. *See Kagan v. Unum Provident*, No. 03 Civ. 8130 (KMK) (GAY), 2009 WL 3486938, at *2 (S.D.N.Y. Oct. 29, 2009) (citing *Glenn*, 554 U.S. at 108). "[T]he significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). Although a court must take a conflict of interest into account and weigh it as a factor in determining whether there was an abuse of discretion, it "does not make *de novo* review appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation." *Id.*

Under *Glenn*, a court must engage in a two-part inquiry. The first step requires determining whether the "plan administrator both evaluates claims for benefits and pays benefits claims." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010) (quoting *Glenn*, 554 U.S. at 112). Next, a court should ask "how heavily to weigh[] the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk[.]'" *Id.* (quoting *Glenn*, 554 U.S. at 117). In sum,

> The conflict of interest at issue . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a

> history of biased claims administration. [. . .] It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117 (internal citations omitted).  Since determining whether the denial of benefits is "tinged" by a conflict of interest is "distinct from the reasonableness of the plan administrators' decision, the district court will not be confined to the administrative record." *Zervos v. Verizon New York, Inc*., 252 F.3d 163, 174 (2d Cir. 2001).

As to the first step of *Glenn*'s two-pronged test, the parties agree that Oxford both evaluates and pays benefits claims.  Doc. 75 at 10; Doc. 79 at 9.  Where the "evaluation of claims is entrusted (at least in part) to representatives of the entities that ultimately pay the claims allowed[,]" it "is precisely the type of interest conflict to which *Glenn* applies." *Durakovic*, 609 F.3d at 139.

The Parties fail to address the second prong in their briefs.  However, the evidence shows that the appeals process was structured in such a way, and that Oxford took affirmative steps, to reduce the risk of bias.  Specifically, the administrative record reveals that Oxford undertook various attempts to contact Dr. Cuttner's office seeking more information and that Dr. Lundblad made efforts to speak directly with Dr. Cuttner on more than one occasion.  *See* Oxford 000019-20, 000092.  Courts have pointed to evidence that a reviewer attempted to contact a beneficiary's treating physician and include his or her input in the file as indicative of an effort to promote accuracy.  *See Siegel*, 2012 WL 2394879, at *16; *see also St. Onge v. Unum Life Ins. Co. of Am.*, 559 F. App'x 28, 32 (2d Cir. 2014) (observing that the administrator consulted with the beneficiary and her treating physician).

Furthermore, while Oxford's initial determination was made by Dr. Lundblad, his decision was reviewed and affirmed at the first-level appeal phase by a different physician and medical director, Dr. Bahr.  *See* Oxford 000015.  Plaintiff's second-level appeal was reviewed externally by yet another physician, at her specific request, who upheld Dr. Lundblad's determination.  *See* Oxford 000122.  Courts have typically credited an administrators' assignment of separate individuals to process a beneficiary's appeal as signaling an effort to reduce potential bias and promote accuracy.  *See Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320,  336 (S.D.N.Y. June 2, 2014) (observing that "the review [of the plaintiff's appeal] was conducted by different individuals than those who made the initial determination to deny Plaintiff's benefits"); *Siegel v. Hartford Life Ins. Co*., No. 10 Civ. 4285 (DRH) (ETB), 2012 WL 2394879, at *16 (E.D.N.Y. June 25, 2012) (noting, in part, that the insurer "assigned separate individuals to process her [the beneficiary's] appeal").

Finally, an administrator's initial decision to award benefits may be viewed as further evidence of an absence of bias because such a decision cuts against its financial interest.  *Siegel*, 2012 WL 2394879, at *17 (citing *Bendik v. Hartford Life Ins. Co*., No. 03 CIV. 8138 (LAP), 2010 WL 2730465, at *5 (S.D.N.Y. July 12, 2010) *aff'd*, 432 F. App'x 24 (2d Cir. 2011)) (an administrator's decision to pay short-term disability benefits, but deny long-term disability benefits diminishes the importance of a conflict of interest).  The fact that Dr. Lundblad approved coverage of Plaintiff's IVIG treatment for three months after speaking with her treating physician suggests that his decision to not extend coverage beyond that time period was not driven by Oxford's financial interest.  *See* Oxford 000019-20.

In terms of proving a structural bias, Plaintiff contends that Oxford has a "history of biased claims," pointing to three cases in which courts in this circuit ruled against Oxford in

20

cases challenging its denial of benefits.  Pl.'s Mem. L. Supp. Mot. Summary J., Doc. 75 at 22-23.

However, in one of the cases Plaintiff cites, the court did not undertake a conflict of interest

analysis.  *Scalamandre v. Oxford Health Plans (N.Y.), Inc*., 823 F. Supp. 1050, 1059 (E.D.N.Y.

1993).  Instead, it applied the *de novo* standard of review only after finding that the explicit terms

of the plan at issue did not grant Oxford discretion to construe the insurance contract.  *Id.*  The

other two decisions Plaintiff cites did indeed result in a finding of bias on behalf of Oxford

warranting *de novo* review.  *See Demonchaux v. Unitedhealthcare Oxford*, No. 10 Civ. 4491

(DAB), 2012 WL 6700017, at *6-8 (S.D.N.Y. Dec. 20, 2012) ("Plaintiff has provided a good

deal of evidence that Defendant's conflict of interest actually affected its decision[.]"); *Schwartz*

*v. Oxford Health Plans, Inc*., 175 F. Supp. 2d 581, 591 (S.D.N.Y. 2001) (same).[21]

However, those decisions are offset by the several cases in this Circuit in which courts

opted to give Oxford's conflict of interest little, if any, weight.  For example, in *Fay v. Oxford*

*Health Plan*, the Second Circuit upheld a district court's application of the arbitrary and

capricious standard of review in a case involving Oxford.  287 F.3d 96, 109 (2d Cir. 2002).  The

Second Circuit pointed out that, given the lower court's conclusion that Oxford's decision to

deny benefits "rested on adequate evidence," it was "preclud[ed] from finding that a conflict of

interest *in fact* affected the outcome of Oxford's review."  *Id*. (emphasis in original).  Similarly,

in *Stern v. Oxford Health Plans, Inc*., a district court again determined that the "plaintiff has

adduced no specific evidence showing that the conflict of interest affected the reasonableness of

---

[21] It is important to note, however, that the mode of analysis undertaken by *Schwartz* has been abrogated by the Second Circuit.  The *Schwartz* court inquiry asked whether the determination made by the administrator was reasonable and whether the evidence showed that the administrator was in fact influenced by such conflict.  175 F. Supp. 2d at 588-89 (quoting *Sullivan v. LTV Aerospace & Def. Co*., 82 F.3d 1251, 1255 (2d Cir. 1996)).  The Second Circuit has since rejected this line of inquiry in favor of the *Glenn* approach, to which this courts adheres. *McCauley v. First Unum Life Ins. Co*., 551 F.3d 126, 128 (2d Cir. 2008) ("We find this standard to be inconsistent with the Supreme Court's instructions in Glenn and abandon it.")

Oxford's determination."  No. 12 Civ. 2379 (JFB) (EBT), 2013 WL 3762898, at *6-7 (E.D.N.Y.

July 17, 2013).  As a result, the conflict of interest was entitled to "little weight" and was

"overwhelmingly outweighed by the other factors supporting Oxford's adverse benefits

determination."  *Id*. at *7.

Given Oxford's efforts to reduce the risk of bias in this case, and prior decisions in which

Oxford's determinations were deemed not to have been tainted by conflict, the Court finds that

there is an insufficient basis to infer "a history of biased claims administration" on the part of

Oxford here.  *See Burgio v. Prudential Ins. Co. of Am.*, No. 06 Civ. 6793 (JS) (AKT), 2011 WL

4532482, at *8 (E.D.N.Y. Sept. 26, 2011) (stating that the court "is reluctant to infer an improper

motive on the strength of the outcome of other cases" where there are a number of conflicting

decisions in which the insurer's denial of benefits has been both reversed and upheld).

### ii.    Case-Specific Allegations of Bias

Ultimately, "[n]o weight is given to a conflict in the absence of any evidence that the

conflict actually affected the administrator's decision."  *Durakovic*, 609 F.3d at 140.  In support

of Plaintiff's contention that her claim was actually affected by a conflict of interest, she points

to several irregularities to argue that Oxford's conflict of interest "led to a result-driven

conclusion."  Doc. 75 at 11.  Plaintiff's strongest points are made in relation to (1) Dr.

Lundblad's failure to consider the fact that she was being treated with Rituxan, and (2) Oxford's

subsequent approval of IVIG treatment in 2013.  Yet even these arguments are ultimately

unavailing.

Information Provided to Dr. Lundblad

First, Plaintiff suggests that Defendants deliberately "walled off" Dr. Lundblad from knowing that she was being treated with chemotherapy in the form of the drug Rituxan. Doc. 75 at 15-16. In arguing why knowledge of her Rituxan treatment would be relevant, Plaintiff cites an excerpt of Rituxan's medication guide, which indicates that some patients who receive the drug develop low antibody levels which may lead to serious infections.[22] *Id*. at 16 (citing Berg. Decl., Ex. 19). However, as Defendants note, the materials submitted by Dr. Cuttner did not reference Plaintiff's Rituxan treatment.[23] Defs.' Mem. L. Opp., Doc. 79 at 3; *see also* Oxford 000363-000374. Therefore, on the record presented to Oxford, no connection was made between the fact that Plaintiff had undergone Rituxan therapy and Dr. Cuttner's decision to prescribe Gamunex.

In any event, Plaintiff has failed to show that Oxford purposely blocked off Dr. Lundblad from learning about her course of treatment or that, had he known, the outcome would have necessarily been different. As Dr. Lundblad testified, the issue of whether a member is undergoing chemotherapy or Rituxan treatment is not in and of itself part of the criteria that Oxford considers pursuant to its policy on approving coverage of IVIG treatment. *See* Berg. Decl., Ex. 9 at 88:7-17; *see also* Nguyen Aff., Ex. C. He also maintained that Plaintiff's Rituxan

---

[22] Defendants argue that, because Plaintiff's course of treatment with Rituxan is outside the administrative record, Plaintiff's reliance on it is irrelevant and should not be considered. Doc. 79 at 3 n.3. However, "evidence outside the administrative record is sometimes relevant, such as, but not limited to, to determine whether the administrator of the plan had a conflict of interest." *Kagan v. Unum Provident*, No. 03 Civ. 8130 (KMK) (GAY), 2009 WL 3486938, at *1 (S.D.N.Y. Oct. 29, 2009); *see also Zervos*, 252 F.3d at 174.

[23] In their opposition papers, Defendants claim that the materials Dr. Cuttner submitted "made absolutely no reference to Rituxan or chemotherapy." Doc. 79 at 3. However, on the progress note which Dr. Cuttner submitted to Oxford "yes" is circled next to the heading "chemo." Oxford 000373. However, the records—to the extent they contain legible handwriting—do not appear to specify whether Plaintiff was *currently* undergoing chemotherapy or whether she received chemotherapy in the form of Rituxan.

treatment "was not a detail that was needed" to make his determination.  Berg. Decl., Ex. 9 at

99:4-5.  There is thus no basis to conclude that Dr. Lundblad's lack of awareness of Plaintiff's

Rituxan treatment is probative of bias resulting from a conflict of interest.[24]

Approval of Gamunex Coverage in 2013

Plaintiff cites Oxford's decision to approve Gamunex treatment in 2013 as further

evidence of a demonstrated conflict of interest.[25]  *See* Doc. 75 at 16-17.  Plaintiff points to the

fact that her IgM levels when Oxford approved coverage for IVIG treatment in 2013 were almost

identical to when Dr. Lundblad denied it in 2011.  *See* Doc. 75 at 17; *compare* Oxford 000372

(reporting Plaintiff's IgM levels were at 42 mg/dl on November 30, 2011), *with* OHP 000011

(noting that Plaintiff's IgM levels were at 46 mg/dl on January 11, 2013).

However, the letter Dr. Cuttner submitted on January 10, 2013 in connection with

Plaintiff's 2013 claim contrasts sharply with the letter she sent in connection with Plaintiff's

2011 request for continuation of coverage.  In 2011, Dr. Cuttner's letter stated that Plaintiff's

pneumonia had been successfully treated with antibiotics, her gammaglobulin levels were

normal, and that it would be "important" for Plaintiff to continue with "prophylactic" Gamunex

treatment.   P-00024.  The 2011 letter does not conceivably suggest that Dr. Cuttner was

prescribing Gamunex in connection with any chemotherapy treatment that Plaintiff was

---

[24] As Defendants note, Dr. Lundblad was only required to review the information Plaintiff and her physician provided him with, which did not mention Rituxan.  Doc. 79 at 11.  "The Second Circuit has never found that ERISA fiduciaries have a duty to gather information."  *Young v. Hartford Life & Acc. Ins. Co.*, No. 09 Civ. 9811 (RJH), 2011 WL 4430859, at *11 (S.D.N.Y. Sept. 23, 2011) *aff'd*, 506 F. App'x 27 (2d Cir. 2012).

[25] In his order to compel production of Plaintiff's 2013 IAR, Magistrate Judge Francis reasoned that "if the reports contain identical information as that before Dr. Lundblad in 2011, but only considered by a different Medical Director, this may also support the inference that a conflict of interest affected the 2011 denial."  Doc. 59 at 12.  Alternatively, Judge Francis noted that "the requested reports may be a double-edged sword for the plaintiff, if they support Oxford's position that S.M.'s condition had changed enough to justify Gamunex coverage[.]"  *Id.*

undergoing to treat her non-Hodgkins lymphoma.  *See id.*  Conversely, the letter Dr. Cuttner

submitted to Oxford in 2013 communicated a much greater sense of urgency, and, more

importantly, provided information that directly related to the suitability of the Gamunex

prescription at the time.  It indicated that Plaintiff's disease "recently transformed to a more

aggressive lymphoma, namely, diffuse B cell large cell lymphoma" and would be "receiving

combination chemotherapy . . . that will put her at risk of severe infections."  *See* Nguyen 2d.

Aff., Ex. A.  Dr. Cuttner indicated that she felt "very strongly" that Plaintiff should receive IVIG

treatment to prevent infections while she was on chemotherapy.  *Id*.  Dr. Hui approved coverage,

citing the fact that Plaintiff was about to commence chemotherapy, though a different form of

chemotherapy than Rituxan, as one of the reasons justifying his determination.  OHP 000011.

He also cited Plaintiff's low IgG levels as an additional factor weighing in favor of approving

IVIG treatment in 2013.  *See* OHP 000011; *compare* Oxford 000372 (reporting Plaintiff's IgG

levels were at 716 mg/dl on November 30, 2011), *with* OHP 000011 (noting that Plaintiff's IgM

levels were at 450 mg/dl on January 11, 2013).

It bears noting that Dr. Lundblad also granted Plaintiff an initial approval, which covered

three months of IVIG treatment, based on similar information.[26]   *See* Oxford 000019.

Ultimately, Plaintiff's 2013 IAR has indeed proved to be a double-edged sword, *see supra* n.25,

in that it tends to show that her condition deteriorated between the denial of coverage in

December 2011 and Oxford's approval in January 2013.

---

[26] After Dr. Hui's initial approval, Plaintiff was denied an extension of coverage in July 2013, again for failure to
provide clinical information.  *See* OHP 000011.

Dr. Lundblad's Qualifications to Review the Claim

Plaintiff also claims Oxford deliberately assigned Dr. Lundblad to evaluate her claim even though he was purportedly:  (1) unqualified to make a medical necessity determination about Gamunex; (2) not Dr. Cuttner's clinical peer; (3) ignored the fact that Plaintiff's condition was life-threatening; and (4) failed to consult with oncologists made available to him by Oxford. Doc. 75 at 11.  However, the Court finds these allegations to be either inaccurate or insufficient to support an inference that a conflict influenced Oxford's reasonable interpretation of Plaintiff's claim.  Regardless of Dr. Lundblad's qualifications, his determination was affirmed by two other physicians including an external reviewer who is indisputably Dr. Cuttner's clinical peer.  *See* Oxford 000015, 0000122.  Furthermore, Plaintiff has failed to introduce evidence showing that such a decision was required to be undertaken by a reviewer with specialized credentials.

As to Plaintiff's assertion that Dr. Lundblad was not a "clinical peer" and ignored Plaintiff's "life threatening" condition in violation of Oxford's own policy, her argument is premised on an erroneous interpretation of the Plan and a misapprehension of Dr. Lundblad's deposition testimony.  *See* Doc. 75 at 11.  The Plan provides that adverse medical necessity determinations can only be made by a "clinical peer reviewer."  Oxford 000159.  While Plaintiff appears to interpret this term literally—i.e., that the reviewer be a clinical peer of the treating doctor—the phrase is not defined by the Plan at the stage of an initial adverse determination. Indeed, even at the internal appeal stage, a "clinical peer reviewer," is—at most—a physician with a current and valid non-restricted medical license.  Oxford 000162.  Even a non-physician may review a member's internal appeal, so long as that individual meets the separate applicable

26

criteria. *Id.* Only at the external appeal phase is a clinical peer reviewer necessarily defined as a physician who has relevant medical expertise. *Id.* Although the Plan does not specify who qualifies as a clinical peer reviewer at the initial review phase, Plaintiff's claim that Dr. Lundblad did not meet the Plan's own specifications is unsubstantiated. Dr. Lundblad is a doctor of osteopathic medicine and is board certified and licensed to practice medicine. Lundblad Aff., Doc. 82 at ¶¶ 2-3. "ERISA and the applicable DOL regulations neither require a plan administrator to rely only upon the opinions of specialists nor preclude a plan administrator from relying on the opinions of physicians trained in internal or occupational medicine." *Topalian v. Hartford Life Ins. Co*., 945 F. Supp. 2d 294, 354 (E.D.N.Y. 2013). Repeatedly, "courts have deemed it sufficient that doctors trained in internal medicine or occupational medicine were retained to review the [p]laintiff's records." *Id.* (collecting cases). Plaintiff's argument that Dr. Lundblad "ignored" her life-threatening condition is unsupported by the deposition testimony that she relies on.[27] Furthermore, Dr. Lundblad's failure to consult with Oxford's oncologists is entitled to little weight, given his conversations with Plaintiff's own oncologist and the fact that a physician specializing in lymphoma and chemotherapy treatment later affirmed his decision. *See* Oxford 000020, 000120-000124.

---

[27] Plaintiff relies on a portion of Dr. Lundblad's deposition testimony in which he responded to several hypothetical questions posed by Plaintiff's counsel, including what he would do if Dr. Cuttner told him, "I need you to approve this because she might die if you deny it." Doc. 75 at 14 (citing Berg. Decl., Ex. 9 at 51-54). Dr. Lundblad replied that his determination, along with the policy which guides it, is based on medical literature and not on a plea from an individual doctor. *See* Berg. Decl., Ex. 9 at 51-54. Furthermore, while he gathers information from the Provider, there may be a difference of opinion. *Id.* More to the point, there is no evidence that Plaintiff's claim for coverage presented such a scenario. *See id.* at 54:12-14. In fact, Dr. Cuttner seemed to suggest that IVIG treatment was merely precautionary, informing Oxford that "it would be important" for Plaintiff to continue "*prophylactic*," (emphasis added) treatment "through the winter months." P-00024.

Plaintiff also points to the fact that Dr. Lundblad was purportedly unaware of Oxford's urgent care policy. *See* Doc. 75 at 14. However, Oxford's urgent care policy is separate from its policy concerning medical necessity determinations and is not at issue in this case. *Compare* Oxford 000154-000155 (detailing Oxford's urgent care policy), *with* Oxford 000159-000160 (describing Oxford's policy on medical necessity determinations).

Plaintiff contends that "Dr. Lundblad has never injected Gamunex, he did not know who manufactured it, and he did not know when it received FDA approval."  Doc. 75 at 12 (citing Berg. Decl. Ex. 9 at 19:3-7).  She also notes that Dr. Lundblad "had no idea what S.M.'s IgM levels were in September 2011, or even what the normal range of IgM levels are generally."  *Id.* (citing Berg. Dec. Ex. 9 at 30:4-8).  However, Plaintiff cites portions of Dr. Lundblad's deposition testimony that do not support these assertions.  Dr. Lundblad simply stated that he "did not recall" Plaintiff's IgM levels *prior* to September 2011 and that he did not know the normal range for IgM levels "off the top of [his] head."  *See* Berg. Decl. Ex. 9 at 19:3-7.  Dr. Lundblad also did not know who manufactures Gamunex "off the top of [his] head," and although he did not appear to know when it received FDA approval, such knowledge is not particularly relevant to the reasonableness of his medical necessity determination.  *See* Berg. Decl. Ex. 9 at 19:3-7.

Finally, Plaintiff claims that Dr. Lundblad ignored the process that he was required to follow, which purportedly compelled him to wait four to six weeks for S.M.'s clinical test results reflecting her IgG and IgM levels without Gamunex, or temporarily denying coverage for four to six weeks until further testing could be done.  Doc. 75 at 18.  Yet, Oxford's second request for additional information explicitly asked for "documentation of impaired antibody production to specific antigens and history of recurrent infections."[28]  P-00041.   The Plan itself indicates that notification of Oxford's decision that a service is not medically necessary when additional information is requested will be provided within either:  (1) two business days of their receipt of

---

[28] The record discredits Plaintiff's contention that Defendants did not ask Dr. Cuttner's office for the information it claims to always request as a matter of policy.  *See* Doc. 84 at 5 (claiming that "on the contemporaneous record, Oxford did not make such a broad demand on S.M. or Dr. Cuttner").  Oxford's first request for documents, on November 23, 2011, mirrors the information that Defendants maintain it is their policy to request.  *Compare* Doc. 68 at 6, *with* P-00040, Oxford 000376.  Oxford's second inquiry reiterated the need for some of the information contained in its first request.  *See* P-00041.

the information; or (2) two business days from the expiration of the period allowed to provide the information, i.e., forty-five days.  Oxford 000159.  Dr. Cuttner actually replied to Oxford's request for additional information within the requisite time period, however, her response did not address Oxford's specific requests.  *See* Oxford 000363-000374.  In any event, both the initial denial and external appeal cited several other factors justifying Oxford's decision.  *See* Oxford 000093, 000124.  Accordingly, Oxford's failure to wait forty-five days to issue a determination does not weigh in support of finding a conflict of interest.

### C.  Evidence Outside the Administrative Record[29]

"The administrative record consists of the documents before the claims administrator when the decision regarding benefits was made."[30]  *Novick v. Metro. Life Ins. Co*., 914 F. Supp. 2d 507, 521 (S.D.N.Y. 2012) (quoting *Rund v. JPMorgan Chase Grp. Long Term Disability Plan*, No. 10 CIV. 5284 LAP, 2012 WL 1108003, at *1 (S.D.N.Y. Mar. 30, 2012)).  In ERISA cases applying the arbitrary and capricious standard of review, the Second Circuit has "repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, 'but which discretion ought not to be exercised in the absence of good cause.'"  *Krauss v. Oxford Health Plans, Inc*., 517 F.3d 614, 631 (2d Cir. 2008) (quoting *Juliano v. Health Maint. Org. of New Jersey, Inc*., 221 F.3d 279, 289 (2d Cir. 2000)).  "Although a

---

[29] As a procedural matter, "[a] motion to strike is the correct vehicle to challenge materials submitted in connection with a summary judgment motion."  *Pokorne v. Gary*, 281 F. Supp. 2d 416, 418 (D. Conn. 2003) (internal citation omitted); *see e.g. Novick v. Metro. Life Ins. Co*., 914 F. Supp. 2d 507, 521 (S.D.N.Y. 2012) (ERISA defendants moved to strike what they claimed were improper extra-record submissions); *Demonchaux*, 2012 WL 6700017, at *12 (same).  Here, neither of the parties moved to strike any materials.

[30] The Court notes that the administrative record, which Defendants submitted, was not organized in any logical fashion and had to be reorganized with great difficulty by the Court.  The administrative record, which consists of several duplicative and barely legible documents, is presented in a semi-chronological form.  Several of the bates stamped numbers are cut off.  Some pages are missing bates stamps altogether.  Most frustrating, the various bates-stamped records are grouped together in a non-sequential order.

Defendant's demonstrated conflict of interest may be an example of good cause, a conflicted administrator does not *per se* constitute good cause[.]"  *Wedge*, 23 F. Supp. 3d at 337 (citing *Demonchaux*, 2012 WL 6700017, at *11) (internal quotation marks omitted).  The application of such a *per se* rule would improperly "allow additional evidence to be presented at the district court level in almost every circumstance on the basis of a presumed conflict of interest" and "eliminate the appropriate incentive for a claimant to submit all available evidence regarding the claimant's condition to the insurance company upon first submitting a claim."  *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 295 (2d Cir. 2004).  In effect, it would "undermine the significant ERISA policy interests of minimizing costs of claim disputes and ensuring prompt claims-resolution procedures."  *Id*.

Typically, district courts "have emphasized a plaintiff's burden to allege facts, with sufficient specificity, that would support the existence of 'good cause' permitting the admission of additional evidence beyond the administrative record."  *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 98 n.2 (2d Cir. 2003) (citing *Hotaling v. Teachers Ins. & Annuity Ass'n of Am.*, 62 F. Supp. 2d 731, 738 (N.D.N.Y. 1999)) (refusing to expand the administrative record where the plaintiff "fail[ed] to allege, with any specificity, whether 'good cause' exists sufficient to permit the introduction of additional evidence").  A court's discretion "should not be exercised in cases where a party fails to demonstrate, beyond mere speculation or conjecture, that the 'administrative record is inadequate to conduct a proper review of the administrative decision.'"  *Hotaling*, 62 F. Supp. 2d at 738 (quoting *DeFelice v. Am. Int'l Life Assur. Co. of New York*, 112 F.3d 61, 65 (2d Cir. 1997)).  Good cause may be found "when the procedures employed in arriving at the claim determination were flawed, and when an insurer's claimed reason for denying a claim was not stated in its notices to the claimant."  *Biomed Pharm., Inc. v. Oxford*

*Health Plans (N.Y.), Inc*., 831 F. Supp. 2d 651, 658-59 (S.D.N.Y. 2011) (citing *Locher*, 389 F.3d at 295).  Such circumstances are not present here and, accordingly, the administrative record will not be expanded.

Dr. Lundblad's Deposition Testimony

Both parties operate under the erroneous assumption that this Court has already expanded the administrative record to include Dr. Lundblad's deposition testimony.[31]  *See* Doc 79 at 7 n.4; Pl.'s Reply, Doc. 86 at 8-9.  Hr'g Tr. 13:16-20, Jan. 10, 2014.  However, while the Court is permitted to look beyond the administrative record to resolve such peripheral issues as alleged conflicts of interest, it must establish good cause before considering such evidence in its substantive analysis concerning the decision to deny benefits.  At no point in time did this Court find good cause to admit Dr. Lundblad's testimony in connection with its *direct review* of Defendants' decision to deny benefits.

Plaintiff relies on Dr. Lundblad's deposition testimony, as is appropriate, to support the arguments which the Court has already rejected under its conflict of interest analysis.  As previously established, Plaintiff has failed to show that Oxford's decision was tinged by a conflict of interest, procedural irregularities, or case-specific bias.  *See supra* Part III.B.i.  Meanwhile, Defendants appear to only use Dr. Lundblad's deposition testimony to rebut Plaintiff's characterization of his responses to counsel's questions.  *See e.g.* Doc. 79 at 4-6, 11-12.  Therefore, there is not good cause to expand the scope of administrative record to include Dr. Lundblad's deposition testimony.

---

[31] Their impression appears to be based on a statement made by this Court at a January 10, 2014 hearing indicating that it did not see any reason why it would not consider Dr. Lundblad's testimony on a motion for summary judgment.  *See* Hr'g Tr. 13:16-20, Jan. 10, 2014.

Rituxan Medication Guide and 2013 IAR

Plaintiff also seeks to introduce the Rituxan medication guide and Plaintiff's 2013 IAR. Doc. 86 at 8-9.  The Rituxan information that Plaintiff seeks to introduce simply describes the medication and its potential side effects.  Berg. Decl., Ex. 19.  It does not establish that Plaintiff was being treated with Rituxan at the time or that she was experiencing a side effect.[32]  More importantly, it is not disputed that Dr. Lundblad was not informed by Dr. Cuttner that Plaintiff was on Rituxan.  The document is thus irrelevant on the facts of this case.

A similar analysis applies to Plaintiff's 2013 IAR.  The Court referenced the 2013 IAR in connection with the conflict of interest analysis, as is allowed.  As the Court previously determined, the report itself, along with Dr. Cuttner's associated submissions, establish that Plaintiff's medical condition declined between 2011 and 2013, justifying Oxford's approval of coverage for Gamunex two years later.  *See supra* Part III.B.i.; *see also* OHP 000011; Nguyen 2d. Aff., Ex. A.  Given the fact that the 2013 IAR does not evidence any major procedural irregularities, the Court will not expand the administrative record to include it.

Medical Journal Articles

Plaintiff objects to the inclusion of three medical articles that Defendants seek to introduce.[33]  *See* Doc. 84 at 14-15.  The external reviewer cited one of the articles in MCMC's

---

[32] Nonetheless, Defendants do not dispute that Plaintiff's non-Hodgkins lymphoma has been treated with Rituxan at various times since 2011.  Doc. 80 at ¶ 4.

[33] The article cited by MCMC was authored by Kanti R. Rai, MD and Michael J. Keating, MD, and was published in *Wolters Kluwer Health UpToDate*.  *See* Kapacinskas Aff. ¶ 7.  The articles cited by Oxford's policy on IVIG coverage include an article written by Francisco A. Bonilla, MD, PhD et al. published in the *Annals of Allergy, Asthma & Immunology*, and an article by Jordan S. Orange, MD, PhD et al published in the *Journal of Allergy & Clinical Immunology*.  *See id.* at ¶¶ 4, 6.

decision.  *See* Oxford 000124.  Oxford's policy on IVIG coverage references the other two

papers in its bibliography.  *See* P-00063.  The article cited by the external reviewer concerns a

sub-type of non-Hodgkins lymphoma, which neither of the parties claim Plaintiff has been

diagnosed with.  Given that Plaintiff does not challenge Oxford's IVIG policy itself, there is no

need for the Court to consider the two articles cited in support of the policy.  Therefore, the

Court will not consider any of the three medical journal articles that Defendants have

produced.[34]

### D.  Denial of Benefits

#### i.    Oxford's Denial of Coverage

The scope of review under the arbitrary and capricious standard is narrow.  *Celardo v.*

*GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (citing *Peterson v.*

*Cont'l Cas. Co*., 282 F.3d 112, 117 (2d Cir. 2002)).  "[D]enials may be overturned . . . only if the

decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of

law.'"  *Fay*, 287 F.3d at 104 (quoting *Kinstler*, 181 F.3d at 249).  "Substantial evidence" is "such

evidence that a reasonable mind might accept as adequate to support the conclusion reached by

the [administrator and] . . . requires more than a scintilla but less than a preponderance."

*Celardo*, 318 F.3d at 146 (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.

1995)) (internal quotation marks omitted).  The Second Circuit has stressed that courts are "not

---

[34] Defendants interpret Plaintiff's papers as also asserting that the external reviewer's decision denying Gamunex coverage falls outside of the administrative record.  See Defs.' Reply, Doc. 87 at 7-8.  As a preliminary matter, the Court does not read Plaintiff's brief as objecting to the inclusion of the external reviewer's decision in the administrative record.  Rather, Plaintiff argues that Defendants' alleged concealment of her 2011 IAR from the external reviewer constitutes actionable conduct outside the scope of ERISA.  Doc. 84 at 8-10.  In any event, the external review decision essentially embodied a final pronouncement on Plaintiff's claim for coverage, which conclusively ensured Oxford's denial of benefits.  The Court must give the external decision some consideration in order to decide the present motions.  "[T]he external appeal constitutes a part of the record informing Defendant's ultimate denial of benefits in this case."  *Alexandra*, 2013 WL 4002883, at *8.

free to substitute [their] own judgment for that of the [plan administrator] as if [they] were considering the issue of eligibility anew." *Id.* (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).

As noted, the Plan provides that Oxford has discretion to deny coverage for any health care service that it determines, in its "sole judgment," to not be medically necessary, as that term is defined by the Plan. *See* Oxford 000228; *see also* Doc. 77 at ¶ 3. The Plan states that Oxford may "adopt reasonable policies, procedures, rules, and interpretations to promote the orderly and efficient administration [of the Plan] . . . with which Members shall comply." Oxford 000227. Courts have held that this exact "discretionary language" grants Oxford the right to establish guidelines, such as the IVIG policy, to assist with benefits determinations. *See Stern*, 2013 WL 3762898, at *8 (citing *Krauss*, 517 F.3d at 622).

It is indisputable that Plaintiff and her oncologist failed to provide Oxford with the information necessary for it to determine that she met the criteria. For an initial request for IVIG treatment, Oxford's IVIG policy states that the documentation required includes office notes indicating the failure of conventional therapy and "clinically significant functional deficiency of humoral immunity as evidenced by documented failure to provide antibodies to specific antigens and a history of recurrent infections," among other information. P-00050. For the continuation of therapy, a member must submit additional information, including documentation of an objective response to therapy and that "the medical condition under treatment has not fully resolved[.]" *Id.*

Although Plaintiff questions whether she was initially granted coverage for Gamunex as an "exception" to Oxford's IVIG policy, *see* Doc. 77 at ¶ 32, Doc. 84 at 7, it appears clear that

Dr. Lundblad approved coverage of the treatment for three months in spite of the fact that the documents submitted by Dr. Cuttner lacked information as to whether Plaintiff could make antibodies against immunizations or common bacteria.  *See* 000075.  In his notes, Dr. Lundblad specifically indicated that "[f]or renewal or continuation, additional clinical information will be required."[35]  Oxford 000019.  When Plaintiff requested an extension of coverage, Oxford sent two requests for additional information.  The first request asked for precisely the information required for an extension of coverage by Oxford's IVIG policy.  *See* Oxford 000376; *see also* P-00050.  Oxford's second request reiterated the need for information that the medical condition under treatment had not fully resolved and documentation of an objective response to therapy.  P-00041.  It also indicated that Oxford still needed "documentation of impaired antibody production to specific antigens[.]"  *Id.*  Not only did Dr. Cuttner's response lack this final piece of information; nothing in administrative record indicates that either Plaintiff or her oncologist specifically addressed or otherwise acknowledged the request.  Therefore, it was not arbitrary and capricious for Drs. Lundblad and Bahr to deny coverage based on the fact that Oxford had not received the information it needed to make a determination.

Plaintiff maintains that Defendants fundamentally misunderstand the use of Gamunex in non-Hodgkins lymphoma patients.  In her briefing, she explains that, "[i]n cancer patients, the injections are given precisely because the patient is unable to produce gammaglobulin naturally, as the cancer patient's immune system is, by definition, deficient."  Doc. 75 at 17-18.  Plaintiff believes that her claim was denied because IVIG treatment "does not *cure* the immune system

---

[35] Plaintiff notes that Oxford's September 22, 2011 letter advising her that coverage had been approved failed to indicate that continuation would require additional clinical information.  Doc. 77 at ¶ 22 (citing Oxford 000089).  However, the policy is clear that initial approvals are for a period of three months only, unless otherwise noted.  P-00050.

deficiency permanently[.]" *Id.* at 18.  Consequently, she argues that requiring data regarding her ability to produce functional antibodies in response to a vaccine challenge, is "nonsense" because it requires a "miracle."  *Id.*  However, Plaintiff appears to misapprehend the nature of the information required under the policy.  Under Oxford's IVIG policy, a claimant must demonstrate a documented "*failure* to produce antibodies to specific antigens."  *See* P-00050 (emphasis added); *see also* Oxford 000093.  Plaintiff's argument is premised on the erroneous assumption that she was required to prove that she *could* produce antibodies in response to antigens and is therefore based on a misreading of the policy.

Plaintiff further argues that the denial of benefits was arbitrary and capricious because Defendants "ignored" the "life-threatening nature" of her condition, including her non-Hodgkins lymphoma and chemotherapy treatment.  Doc. 86 at 3.  However, the materials Dr. Cuttner submitted in connection with her request for continuation of coverage contained no indication that she was prescribing Gamunex as part of Plaintiff's cancer treatment or in an attempt to mitigate any side-effects caused by Rituxan.  *See* Oxford 000364-000374.  Other than a document containing the word "CHEMO" with "yes" circled next to it, the Court is unable to discern whether Plaintiff was a cancer patient undergoing chemotherapy treatment at that point in time.  *See id.*  Nothing in Dr. Cuttner's letter to Oxford indicates that she was prescribing Gamunex in connection with Plaintiff's non-Hodgkin's lymphoma or associated chemotherapy treatment.  *See* Oxford 000364.

Defendants point to several pieces of evidence in the administrative record adequate to support Oxford's conclusion that Gamunex was not medically necessary.  First, Dr. Cuttner's letter informed Oxford that Plaintiff's pneumonia was successfully treated with antibiotics.  Oxford 000364.  Dr. Cuttner's office notes, dated November 29, 2011, indicated that Plaintiff

"generally feels well," "no shortness of breath," "no chest pain," "no muscle or joint pain," "no headache," "no fever," and, most importantly, "no infection."  Oxford 000373.  All of Plaintiff's laboratory results reported on November 30, 2011 fell within the "normal" range, including her IgG, IgM, and IgA levels.  Oxford 000372.  Furthermore, the fact that Dr. Cuttner characterized her recommendation of IVIG treatment as "prophylactic," suggests that the medical condition under treatment had fully resolved.  Oxford 000364.  Given the foregoing information provided by Dr. Cuttner, Oxford's determination that Gamunex treatment was not medically necessary was clearly based on substantial evidence.

### ii.    The External Appeal

Defendants ask the Court to give the external reviewer's decision to uphold Oxford's denial of benefits "substantial deference."  Doc. 68 at 19-20.  In support of this argument, Defendants cite a decision issued by a district court in the Southern District of Florida.  *Id.* at 19.  In *Alexandra H. v. Oxford Health Ins., Inc*., the court determined that New York's external appeal law is not preempted by ERISA and that, given that the external review decision is binding, it "requires a plan to divest its discretion in favor of the external reviewer's decision."[36]

---

[36] The New York law provides, in relevant part:

> An insured . . . shall have the right to request an external appeal when:
>
> (1)(A) the insured has had coverage of the health care service, which would otherwise be a covered benefit under a subscriber contract or governmental health benefit program, denied on appeal, in whole or in part, pursuant to title one of this article on the grounds that such health care service does not meet the health care plan's requirements for medical necessity, appropriateness, health care setting, level of care, or effectiveness of a covered benefit, and
>
> (B) the health care plan has rendered a final adverse determination with respect to such health care service or both the plan and the insured have jointly agreed to waive any internal appeal, or the insured is deemed to have exhausted or is not required to complete any internal appeal[.]

N.Y. Ins. Law § 4910(b)(1).

No. 11 Civ. 23948, 2013 WL 4002883, at *8-9 (S.D. Fla. Aug. 6, 2013). In such situations, the court reasoned that a *de novo* standard of review must apply. *Id*. The Court further concluded that "its review . . . must be confined to whether Defendant complied with the external reviewer's decision." *Id*. at *9. In other words, Defendants argue that the Court's analysis should be limited to determining whether it implemented the external reviewer's decision. And because Oxford complied with the external reviewer's decision of coverage, a holding in favor of Oxford would thus be compelled.

As a preliminary matter, the Court notes that the external reviewer's decision to uphold the denial of benefits was reasonable.[37] The external reviewer noted that, other than Plaintiff's two infections, there was no clear history of recurrent severe infections. *Id*. Furthermore, the external reviewer observed that the decision was supported "by the lack of any evidence that this patient has deficient humoral responses to vaccination." *Id*. As a result, there was "insufficient information" to establish that withholding IVIG treatment would clearly be detrimental or that providing IVIG treatment would be health beneficial. Oxford 000124. In any event, the outcome is the same regardless of whether the Court limits its review to Oxford's initial determination, or if it applies the *de novo* standard to determine whether Oxford complied with the external reviewer's decision.

---

[37] In a separate section of Plaintiff's motion for summary judgment, in which she accuses Defendants of fraudulent concealment, Plaintiff notes that Oxford failed to submit her 2011 IAR to MCMC. Doc. 75 at 19. She also accuses an Oxford representative of omitting the fact that Dr. Lundblad reversed his position on whether Gamunex should be covered in September 2011, and that Plaintiff was being treated for non-Hodgkins lymphoma with Rituxan. *Id*. at 20. However, the external reviewer's decision was based on a failure to show a history of severe infections or deficient humoral responses to vaccination, and Plaintiff does not establish that his decision would have been impacted by the information. Furthermore, Plaintiff did not herself provide the purportedly missing information in her external appeal application, which included various attachments detailing her medical history and communication with Oxford, nor does she allege that she was prevented from doing so. *See* P-00001-00041.

### E.  Plaintiff's Breach of Fiduciary Duty Claim

#### i.  Source of Fiduciary Duty

A claim for breach of fiduciary duty under ERISA typically falls under 29 U.S.C.A.

§ 1104(a)(1)(B), which requires plan fiduciaries to discharge their duties "solely in the interest of

the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA

§ 1132(a)(1)(B) only allows for relief under the Plan's terms as found by the court; "a court may

not 'reform' the plan or provide other equitable relief under this section."  *Miller v. Int'l Paper*

*Co.*, No. 12 Civ. 7071 (LAK) (JLC), 2013 WL 3833038, at *3 (S.D.N.Y. July 24, 2013) (citing

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1876-77 (2011)).  In contrast, ERISA § 502(a)(3)

allows a "participant, beneficiary, or fiduciary" to bring a civil action seeking "(A) to enjoin any

act or practice which violates any provision of [ERISA] or the terms of [a] [benefit] plan, or (B)

to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any

provisions of [ERISA] or the terms of [a] plan."  This provision has been interpreted as creating

a cause of action for claims that a fiduciary has violated ERISA by "providing false or

misleading information regarding benefits or . . .  has failed to provide notices that are required

by statute."  *Miller*, 2013 WL 3833038, at *3 (internal citations omitted).

Plaintiff fails to identify the statutory basis that is the predicate for her breach of fiduciary

duty claim.  The Amended Complaint merely asserts that "Defendants owed S.M. a fiduciary

duty in determining the medical necessity of S.M.'s treatment in accordance with the Plan" and

that they breached their fiduciary duties "by putting their own interests ahead of Plaintiff's."

Am. Compl. ¶ 47.  In its prayer for relief, the Amended Complaint requests a "[d]eclaration that

Defendants have breached their fiduciary duties under the Plan by employing a sham appeal

process." *See* Am. Compl.  However, in her moving papers, Plaintiff asks the Court to either

allow her to proceed with a fraudulent concealment claim against Defendants or find that they

breached their fiduciary duty under ERISA by failing to provide the external reviewer with

Plaintiff's 2011 IAR.  Doc. 75 at 21.  Plaintiff alleges that Williams, the Oxford employee who

prepared the materials submitted to the external reviewer, omitted and misrepresented several

pieces of information in her submissions to MCMC.  *Id.* at 20.  Plaintiff further requests the

Court to "reform the terms of the plan to require Oxford always to provide all Individual

Authorization Reports to external reviewers;" or to enjoin Defendants from excluding production

of the report to external reviewers.  Besides the fact that this allegation was not contained in the

Amended Complaint, Plaintiff once again fails to point to any violation of ERISA or the Plan for

which she is seeking redress through this request.

### ii. Available Remedies for Breach

"Injunctive relief is generally appropriate only when there is an inadequate remedy at law

and irreparable harm will result if the relief is not granted."  *Nechis v. Oxford Health Plans, Inc*.,

421 F.3d 96, 103 (2d Cir. 2005).  In order to obtain injunctive relief under ERISA § 1132(a)(3), a

plaintiff must show irreparable harm and the inadequacy of legal remedies.  *Id*. (citing *Ticor Title*

*Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999)).  Here, as in *Nechis*, Plaintiff cannot satisfy

the conditions required for injunctive relief as any harm to her can be compensated by money

damages that would allow her to recover the value of benefits wrongly denied.  In an affidavit

submitted to the Court, one of Plaintiff's counsel of record states that "[f]rom December 2011 to

February 2012, S.M. was treated with 3 injections of Gamunex[,]" which she and her husband

paid for out-of-pocket.  Matays Aff. ¶ 4.  Plaintiff does not cite any damage that she suffered as a

result of discontinuing her Gamunex treatment in February 2012.[38]  Indeed, almost all of the remedies that Plaintiff seeks are compensatory in nature.[39]  The Second Circuit has repeatedly rejected "invitation[s] to perceive equitable clothing where the requested relief is nakedly contractual."  *Nechis*, 421 F.3d at 104; *see also Coan v. Kaufman*, 457 F.3d 250, 264 (2d Cir. 2006) (the plaintiff's request for an "injunction requiring the defendants to restore funds to the defunct 401(k) plan to be distributed to former participants, 'does not transform what is effectively a money damages request into equitable relief.'"); *Yoon v. Fordham Univ. Faculty*, 173 F. App'x 936, 941 (2d Cir. 2006) (dismissing the plaintiff's § 1132(a)(3) claims where his "prayer for declaratory relief is merely a prelude to a claim for damages").

The only arguably equitable relief that the Amended Complaint seeks consist of:  (1) a permanent injunction enjoining Defendants from denying Plaintiff from "learning the basis of, including the identity and qualifications of, the doctors defendants rely on in reaching 'not medically necessary' conclusions[;]" and (2) a declaratory judgment requiring Defendants to "disclose the monetary relationship between Oxford/UnitedHealth and any private company purporting to conduct an external appeal[.]"  Am Compl.  However, Plaintiff never claims that Oxford denied her this information.  Plaintiff was indeed provided with the basis for Oxford's medical necessity determination and informed of her right to obtain a copy of the clinical review criteria free of charge in both of the letters she received from Oxford.  *See* Oxford 000094-95, 000101-03.  The first letter notifying Plaintiff of Oxford's initial adverse determination provided

---

[38] The Court further notes that, under Oxford's IVIG policy, continuation of IVIG treatment will only be approved for six months.  P-00050.

[39] Plaintiff requests a judgment ordering that Defendants pay all applicable medical benefits to which she is entitled, fees related to their failure to timely provide information requested, in addition to attorney's fees and litigation costs. Am. Compl.  She also asks for a declaration that Defendants violated her rights and the terms of the Plan by failing to pay medical benefits and a permanent injunction enjoining Defendants from denying Plaintiff the right to receive coverage of Gamunex.  *Id.*

Dr. Lundblad's name and phone number, indicating that if Plaintiff's provider had any questions regarding the decision, she could contact him. Oxford 000093. The second letter indicated that the internal appeal review was conducted by a physician specializing in internal medicine. Oxford 000101. Ultimately, "Oxford has no duty to disclose to plan participants information additional to that required by ERISA." *Nechis*, 421 F.3d at 102.

Plaintiff's papers also demand "disgorgement from defendants of all ill-gotten gains, and to prevent defendants' unjust enrichment." Doc. 75 at 23-24. Specifically, Plaintiff is seeking restitution of her premium payments from December 2011 through December 2012 totaling $71,607.68. *Id.* First, the Court has already determined that Oxford's denial of coverage was not arbitrary and capricious; there is, therefore, no factual basis for the claim. Second, in *Nechis*, the Second Circuit determined that the plaintiff was not entitled to the disgorgement of premiums she paid for health care coverage under § 502(a)(3) of ERISA. 421 F.3d at 103-104.

Putting Plaintiff's demands for relief aside, Plaintiff has not shown that Oxford breached its fiduciary duties to her at any point in time. "A fiduciary breaches his § 1104 duty to a plan participant by preventing or interfering with the receipt of benefits to which the participant is entitled." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 813 (2d Cir. 1987). The administrative record supports the conclusion that Oxford conducted a thorough and fair review of Plaintiff's claim, which included various requests for additional information, phone calls with Plaintiff's provider, and an internal appeal that was ultimately upheld by an external reviewer. *See* P-00040-41, Oxford 000019-21, 000124. As to Williams' conduct, which is discussed more thoroughly below, Plaintiff has failed to raise an inference of wrongful conduct, let alone fraud. Nor does Plaintiff allege that Williams was performing anything other than a ministerial task when she responded to MCMC's request. "[A]llegations regarding the negligent and even the

intentionally poor performance of administrative tasks cannot suffice to constitute breaches of

fiduciary duties[.]"  *Forgione v. Gaglio*, No. 13 Civ. 9061 (KPF), 2015 WL 718270, at *10

(S.D.N.Y. Feb. 13, 2015) (citing *Bell v. Pfizer, Inc*., 626 F.3d 66, 74 (2d Cir. 2010) ("Falling

outside these limits [of the term 'fiduciary'] are plan employees who perform ministerial tasks

with respect to the plan, such as the application of rules determining eligibility for participation,

preparation of plan communication materials, the calculation of benefits, and the maintenance of

employee records.).  "Finally, where a plaintiff asserts a breach of fiduciary [duty] claim based

on a material misrepresentation or omission, the plaintiff must establish detrimental reliance."

*Bell*, 626 F.3d at 75 (citing *King v. Pension Trust Fund of the Pension Hospitalization & Benefit*

*Plan of the Elec. Indus*., 131 F. App'x 740, 742 (2d Cir. 2005)).  As explained below, Plaintiff

has failed to allege or show detrimental reliance.  This, in addition to the fact that Plaintiff does

not seek appropriate equitable relief under § 1132(a)(3), justifies dismissal of any breach of

fiduciary duty claims that Plaintiff is attempting to assert.


### F.  Plaintiff's Motion to Sever

Plaintiff asks the Court to sever her claims for fraudulent concealment, empanel a jury,

and hold a trial.  Doc. 75 at 21.  However, the Amended Complaint makes no mention of a

fraudulent concealment claim, which Plaintiff raises solely in her moving papers.  On January

10, 2012, MCMC submitted a request to Oxford for "all relevant medical records and treatment

information" in Oxford's possession.[40]  Berg Decl., Ex. 12.  Plaintiff's fraudulent concealment

---

[40] Plaintiff maintains that this request included the following:

> Complete history, physical examination, laboratory assessment indicating the
> patient's performance status (eg, liver renal, pulmonary hemopoietic functioning),
> and, if applicable, results of pre-transplant evaluation including, for eg, MUGA
> and pulmonary function tests.

allegations are based on Williams' response to MCMC's request for documents.  Doc. 75 at 19.

Specifically, Plaintiff asserts that, in a letter responding to MCMC, Williams "made a series of

false representations and omissions" consisting of the following:

> (1) omi[ssion] [of] the fact that Dr. Lundblad denied coverage on
> September 16, 2011, then changed his mind after speaking to Dr.
> Cuttner on September 21, 2011, then changed his mind again on
> September 22, 2011, limiting coverage for three months, then
> changed his mind for the final time in denying coverage on
> December 7, 2011; (2) affirmatively misrepresent[ing] that the
> coverage of Gamunex . . . was because of 'an exception for life
> threatening pneumonia,' a notation that appears nowhere in the
> contemporaneous evidence; (3) [failure] to disclose the fact that
> S.M. was being treated for non-Hodgkins lymphoma with Rituxan;
> and (4) misrepresent[ing] the length of time that Dr. Cuttner
> requested coverage of Gamunex for S.M., unilaterally reducing Dr.
> Cuttner's request for coverage for one year to three weeks.

Doc. 75 at 20.  Plaintiff also notes that Oxford's submission failed to include her 2011 IAR.  *Id*.

at 19.  Defendants argue that Plaintiff is attempting to "assert a fraud claim on summary

judgment and circumvent Rules 15(a) and 9(b) of the Federal Rules of Civil Procedure."  Doc.

87 at 9-10.  They further contend that Plaintiff's fraudulent concealment claim is preempted by

ERISA.  Doc. 79 at 23.

There are three independent bases to deny Plaintiff's request.  First, Plaintiff's motion

must be denied because the court has already determined that, to the extent Plaintiff "only

challenges a medical necessity determination that was required under the terms of an ERISA-

regulated plan," her claims are preempted because Defendants' "actions implicate no other

---

> Summary of the course of the illness, with the date of all surgical and other
> procedures (eg, chemotherapy, radiotherapy) and other relevant therapeutic
> interventions (eg, drugs), and patient's subsequent course, including
> substantiation of providers' claims of patient responses to prior interventions.

*See* Doc. 75 at 19.  However, the exhibit Plaintiff cites, which consists of MCMC's request for information, fails to
include this quoted language.  *See* Berg. Decl., Ex. 12.

independent legal duty."[41]  Doc. 25 at 10.  Although Plaintiff's original complaint did not allege

the conduct that forms the basis for her fraudulent concealment challenge, it did accuse

Defendants of fraud, deceptive trade practices, and unjust enrichment.  *See* Defs.' Notice

Removal, Ex. A, Doc. 1 at ¶¶ 48-51.  In determining that Plaintiff's causes of action were

preempted by ERISA, the court stated "[w]hether S.M.'s claim is framed as one for fraud, for

deceptive trade practice, or for unjust enrichment, her claim turns on Oxford's determination that

Gamunex was 'not medically necessary' and constitutes a claim 'to recover benefits due' under

Section 502(a)(1)(B)."  Doc. 25 at 8.

Plaintiff's motion to sever may also be denied on the basis that she did not allege a

fraudulent concealment claim in the Amended Complaint.  Nor will the Court sua sponte grant

Plaintiff leave to amend where she has not requested it.[42]  First, Plaintiff has failed to provide the

Court or Defendants with a proposed amended complaint.  "It is well-settled that when seeking

leave to amend, the movant must submit 'a complete copy of the proposed amended complaint

. . . so that both the Court and the opposing party can understand the exact changes sought."

*Akran v. United States*, 997 F. Supp. 2d 197, 207 (E.D.N.Y.) *aff'd*, 581 F. App'x 46 (2d Cir.

2014) (quoting *La Barbera v. Ferran Enterprises, Inc.*, No. 06 Civ. 2678, 2009 WL 367611, at

*3 (E.D.N.Y. Feb. 10, 2009)).  Plaintiff's papers do not cure this defect.

---

[41] Furthermore, the court noted that *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002)—in which the Supreme Court found that claims brought under an Illinois statute similar to New York Public Health Law § 4910 were not preempted by ERISA—"has no application here."  Doc. 25 at 10 n.7.  It found that, "unlike the plaintiff in *Rush*, who sued to compel compliance with an Illinois statute [. . .], S.M.'s complaint does not allege a violation of, or even mention, New York Public Health Law Section 4910."  *Id.*

[42] In its March 21, 2013 Order, the Court reminded Plaintiff that "[a]ny request for leave to amend is to be made by motion, in compliance with Federal Rule of Civil Procedure 15(a)(2)."  Doc. 25 at 10 n.8.  On January 10, 2014, Plaintiff requested leave to revise the Amended Complaint to add allegations as to why she believes there is good cause to consider evidence outside of the administrative record.  Hr'g Tr. 9:22-23, Jan. 10, 2014.  The Court denied Plaintiff leave to amend upon determining that she was not "alleging any new claim."  *Id.* at 10:21-22, 13:11-13. During the hearing, Plaintiff provided no indication that she was seeking to add a fraudulent concealment claim.

Finally, to the extent the basis for the proposed claim is contained in Plaintiff's summary judgment papers, it is evident that her allegations are insufficient to state a claim.  Under Federal Rule of Civil Procedure 9(b), claims for fraud, including claims for fraudulent concealment, must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). Under New York law, which Plaintiff invokes, fraudulent concealment requires proof of:  "(1) failure to discharge a duty to disclose; (2) intention to defraud, or scienter; (3) reliance; and (4) damages."  *Ferring B.V. v. Allergan, Inc*., 932 F. Supp. 2d 493, 511 (S.D.N.Y. 2013) *reconsideration denied*, No. 12 Civ. 2650 (RWS), 2013 WL 4082930 (S.D.N.Y. Aug. 7, 2013) (quoting *TVT Records v. Island Def Jam Music Grp*., 412 F.3d 82, 91 (2d Cir. 2005)).  In her papers, Plaintiff has failed to adequately allege reliance or damages.  She provides no indication that either she or MCMC reasonably relied on Defendants' alleged misrepresentations and omissions.[43]  Nor does Plaintiff allege that she suffered losses that were a "direct, immediate, and proximate result of the misrepresentation" and independent of other causes.  *Warren v. John Wiley & Sons, Inc*., 952 F. Supp. 2d 610, 623 (S.D.N.Y. 2013) (quoting *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993)).  The fact that external reviewer's final determination did not rely on Williams' alleged misrepresentations or allude to the absence of information that would have been found in the 2011 IAR cuts against the presence of these last two factors. Instead, the decision of the external reviewer was based on an absence of a "clear history of recurrent severe or life threatening infections" and "the lack of any evidence that this patient has deficient humoral responses to vaccinations."  Oxford 000124.  The purportedly omitted information would not have compelled a different result.

---

[43] There is also "confusion in the federal courts" as to whether a third-party's reliance upon a misrepresentation by a defendant, which results in injury to a plaintiff, is sufficient to satisfy the reliance requirement.  *See Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, 896 F. Supp. 2d 198, 203-205 (E.D.N.Y. 2012).

Plaintiff's characterization of Williams' submission to the external reviewer as "fraudulent" is meritless.  As a preliminary matter, Plaintiff fails to cite any authority for the proposition that Oxford was *required* to provide the IAR.  Plaintiff's claim that Williams' representation that coverage was approved for three months as an exception "appears nowhere in the contemporaneous evidence" is inaccurate.  On December 7, 2011, Dr. Lundblad wrote in Plaintiff's IAR, "[p]reviously approved for 3 months as an exception in the setting of a life threatening pneumonia."  Oxford 000020.  The only apparent reason for Plaintiff contesting this statement is because Oxford did not directly inform her that it was granting coverage as an exception to its policy.  That in itself does not make Williams' statement misleading or untrue. The fact that Plaintiff's own doctor did not cite her Rituxan treatment as a justification for prescribing Gamunex casts further doubt on the implication that Williams actively concealed the fact that Plaintiff underwent Rituxan therapy.  Lastly, the external reviewer stated that he had sufficient information to make a determination.  Oxford 000123.

Plaintiff's motion to sever is denied.

## G.  ERISA Penalties

ERISA § 502(c) provides:

> (1) Any administrator . . . (B) who fails or refuses to comply with a request for any information *which such administrator is required by this subchapter to furnish* to a participant or beneficiary . . . by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may *in the court's discretion* be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c) (emphasis added).

47

The Amended Complaint states that Defendants "failed or refused" to respond to Plaintiff's January 10, 2012 letter requesting information in a timely manner.  Am. Compl. at ¶ 43(c).  Plaintiff's January 10, 2012 letter asked Oxford to produce certain records, including "all notes or other instruments prepared" by the reviewing physicians and "any and all materials that the previously referenced physician[s] relied upon" in analyzing Plaintiff's request for coverage.  P-00042.  Plaintiff's papers clarify that Defendants failed to timely produce the following items:  (1) Dr. Lundblad's receipt of Dr. Cuttner's December 2011 facsimile; (2) the complete file of the information Williams submitted to MCMC; and (3) five IARs.  Doc. 86 at 15.  Plaintiff indicates that Defendants finally produced (1) the 2011 facsimile on December 13, 2013, (2) the file Williams submitted on December 12, 2013, and (3) one of the IARs on April 1, 2014.  *Id*.  Plaintiff also objects to the fact that Defendants have introduced the three medical journal articles as part of the administrative record after Plaintiff demanded that they confirm that the entire administrative record had been produced on December 12, 2013.  *Id*.  Consequently, Plaintiff calculates statutory penalties totaling $79,500.  *Id*.

Plaintiff has not demonstrated that she is entitled to penalties under 29 U.S.C. § 1132(c).  In determining whether Plaintiff is entitled to a statutory award, the Court may consider whether Plaintiff was prejudiced by Oxford's alleged failure to respond.  *See Grohowski v. U.E. Sys., Inc.*, 917 F. Supp. 258, 261 (S.D.N.Y. 1996).  It may also consider other factors, including bad faith or intentional conduct on the part of defendant and the length of the delay.  *Ginsberg v. Valhalla Anesthesia Associates, P.C.*, 971 F. Supp. 144, 149 (S.D.N.Y. 1997) (citing *Pagovich v. Moskowitz*, 865 F. Supp. 130, 137 (S.D.N.Y. 1994)).  Plaintiff fails to cite a single provision of ERISA that requires Defendants to produce the information she cites as the basis for penalties under the statute.  She does not claim she has suffered prejudice, nor has she shown bad faith or

intentional conduct.  Plaintiff's request for penalties under 29 U.S.C. § 1132(c) is therefore denied.

### H.  Attorney's Fees

A plaintiff's request for attorney's fees in an ERISA action is governed by 29 U.S.C. § 1132(g)(1), which provides:  "[i]n any action under this subchapter . . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  An ERISA plaintiff "must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)[.]"  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 680 (1983)).  "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'"  *Id.* (quoting *Ruckelshaus*, 463 U.S. at 688 n.9).

Plaintiff has not achieved *any* success on the merits.  Therefore, she is not entitled to attorney's fees or costs.

**IV.    Conclusion**

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is DENIED

and Defendant's Motion for Summary Judgment is GRANTED.   Plaintiff's motion to sever is

DENIED.   The Clerk of the Court is respectfully directed to terminate the motions, Docs. 66, 67,

and to close this case.

It is SO ORDERED.


Dated: March 23, 2015
       New York, New York


Edgardo Ramos, U.S.D.J.